**ENVIRONMENTAL PROTECTION, INSPECTION, AND CONSULTING, INC., Appellant/Cross–Respondent,**

v.

**CITY OF KANSAS CITY, Missouri, Respondent/Cross–Appellant.**

**Nos. WD 56182, WD 56183.**

Missouri Court of Appeals, Western District.

Dec. 26, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30, 2001.

Application for Transfer Denied March 20, 2001.

---

362

Daniel J. Ross, Kansas City, MO, for appellant.

M. Margaret S. Moran, Kansas City, MO, for respondent.

Before LOWENSTEIN, P.J., LAURA DENVIR STITH and NEWTON, JJ.

NEWTON, Judge.

The litigation and the eventual appeals between Environmental Protection, Inspection, and Consulting, Inc. (EPIC) and the City of Kansas City, Missouri (KCMo) arose from a construction contract for building a replacement spillway at the Kansas City Zoo. Although the contract provided for an initial completion date of four months, construction of the zoo spillway took fourteen months. The contract specified payment of $400,000.00 for the spillway project. Yet, in the ensuing litigation, EPIC sought the additional sum of $625,000.00 for breach of contract, late payment interest under the Prompt Payment Statute, and $100,000.00 for negligent maintenance of property.

## Procedural Background

The litigation over the zoo spillway began in 1994 in the United States District Court. Included in that lawsuit was EPIC's civil rights action in which KCMo prevailed on summary judgment. The remaining actions were dismissed without prejudice in 1996 and were refiled in the Jackson County Circuit Court the same year.

In the circuit court petition, EPIC reinstituted the actions against KCMo that are the subject of this appeal: Count I, negligent maintenance of property that caused flooding on the work site; Count X, breach of contract for failure to pay amounts due and for late payment interest. Counts II through IX in the petition sought damages for negligence, interference with contract, negligent misrepresentation, fraudulent misrepresentation, and civil conspiracy. The corporate defendants involved were the management, consultant, and engineering firms hired by KCMo for work on the new zoo project. The individual defendants included construction managers, engineers, the KCMo deputy director of Parks and Recreation, the KCMo contract administrator, and a KCMo assistant attorney.

The jury trial began in February 1998 and lasted six weeks. At the end of evidence, the trial court granted directed verdicts for the defendants on Counts II

through IX. After argument and submission of Counts I and X, the jury returned unanimous verdicts with money damages for EPIC and against KCMo. On the negligence action, the jury awarded EPIC $40,000.00 after reduction for 20% fault. For breach of contract, the jury set damages at $561,200.00. In addition, the jury imposed interest of $454,572.00 under the Prompt Payment Statute. The total damages awarded to EPIC equaled $1,015,772.00.

In post trial rulings, the trial court granted judgment notwithstanding the verdict (JNOV) for KCMo and set aside EPIC's $454,572.00 award of late payment interest. The court conditionally granted a new trial for KCMo if the JNOV on Prompt Payment interest were reversed on appeal. In further post-trial rulings, the trial court denied (1) KCMo's motion for JNOV/new trial on the negligence and breach of contract claims, and (2) EPIC's motion for attorney fees under the Prompt Payment Statute. In its amended judgment, the trial court upheld EPIC's damage awards of $40,000.00 for negligent maintenance of property and $561,200.00 for breach of contract for a total judgment of $601,200.00.

Both EPIC and KCMo appeal. Epic's appeal centers on the Prompt Payment Statute and concerns the JNOV setting aside its $454,572.00 late payment interest award, the ordering of a conditional new trial, and the denial of attorney fees. In its cross appeal, KCMo challenges the denials of its motions for directed verdict and JNOV/new trial on the breach of contract claim.

## Factual Background

In May 1992, KCMo awarded EPIC the construction contract on the replacement spillway for the new zoo project. EPIC had submitted the lowest bid. The contract amount for the spillway was $400,000.00, while the projected costs for the entire zoo renovation was $50,000,000.00. EPIC was to receive its compensation in progress payments. The contract set the time for completing the spillway at 120 days or four months. The contract provided procedures for requesting additional time for weather delays and additional compensation for unforeseen conditions requiring extra work.

The work site for the new spillway was on the seven-acre Lake of the Woods in Swope Park in Kansas City, Missouri. Gregory Boulevard ran across the top of the existing dam. While the then-existing spillway had channeled water to the Swope Park Lagoon, the new spillway was to divert water to the Blue River. The new spillway was designed with three components: a concrete box culvert or conduit connecting an inlet structure west of Gregory and an outlet structure east of Gregory. The specifications called for building the spillway without draining the lake. To accomplish this, EPIC was required to build a cofferdam, a temporary structure, to dam up the water to allow excavations for the spillway.

EPIC began its work on the spillway June 20, 1992, but did not complete the project until fourteen months later. The summer months of 1992 brought heavy rainfalls of over fifteen inches. In spite of the adverse weather, EPIC began constructing the cofferdam from the clay under the existing dam. Toward late summer, the cofferdam was complete. By July 1992, EPIC began excavations for the spillway. As work progressed during the fall months, EPIC installed the sheet pilling; placed and poured the concrete forms for the box culvert as well as the inlet and outlet structures.

Although the walls of the cofferdam held the water back, water seeped from beneath the cofferdam. The seepage required pumping. In October 1992, the water backup from the seepage caused unsafe conditions and required the inlet structure excavation to be shut down. EPIC consulted with KCMo's engineers about the seepage problem, which re-

mained unresolved. To combat the seepage, EPIC received permission from KCMo to inject urethane grout at the base of the cofferdam and to lower the water level of the entire lake. Through its own investigation, EPIC determined that the water flowed from a discrete layer of porous shot rock under the cofferdam. KCMo's representatives directed EPIC to proceed with removal of the rock.

During the discovery phase of the litigation, EPIC found out about a rock haul road submerged in the lake near the cofferdam. Although KCMo and its engineers knew of the submerged road's existence, the bidding materials and the contract for the spillway project contained no reference to it. The road had been constructed in 1990 as a part of KCMo's chlordane remediation project. The materials composing the road were contaminated and consisted of packed rock that was porous and allowed water seepage.

In November 1992, the spillway project suffered another setback. A KCMo work crew entered EPIC's work site and filled a ditch near the existing spillway with dirt. On November 19, the Kansas City area again experienced heavy rainfall. Because of the blockage by the work crew, the waters rose over the top of the cofferdam and flooded the new spillway work site. The resulting flood created an emergency situation: the police were called; ambulances were placed on standby; Gregory Boulevard had to be closed. Although the cofferdam sustained damage, its walls remained intact. EPIC lost equipment and materials at the work site. The flooding necessitated extensive repairs, replacement, pumping, and cleanup.

In meetings and correspondence, KCMo urged EPIC to timely complete the spillway project. To do so, EPIC provided extra work. In spite of EPIC's requests for change orders, KCMo approved change orders amounting to $12,466.00 only.

In its last payment application, Contract Payment Request # 9 Revised dated July 19, 1993, EPIC sought payment of $11,080.07. The KCMo project consultant denied the application but recognized that the zoo spillway project was 98% complete.

EPIC and KCMo never reconciled their differences. The final contract payment and the change order requests remained unpaid. EPIC was sued by a materials supplier. Because of the losses sustained on the spillway project, EPIC was forced to close its business in 1994.

As a result, EPIC sued KCMo. EPIC's judgment for negligent maintenance of property, which has not been appealed, was based on evidence of the dangerous condition on land created by the flooding of EPIC's · work site. The $40,000.00 award on the negligence claim represented EPIC's damages for the loss of its business concern. On its breach of contract claim, EPIC relied principally on evidence that the submerged rock haul road constituted a changed condition which required payment of the change order requests under the contract. As a defense, KCMo submitted evidence that EPIC's faulty construction of the cofferdam caused the additional work. The jury awarded EPIC $561,200.00 for breach of contract and used that amount to calculate the late payment interest of $454,572.00 under the Prompt Payment Statute.

### KCMo's Cross Appeal: Breach of Contract

Challenging the breach of contract judgment, KCMo asserts its entitlement to a JNOV for the lack of a submissible case and to a new trial for submission of an erroneous verdict director and verdict form. KCMo's submissibility and instructional challenges are intertwined, but are governed by different standards of review. In reviewing the denial of a motion for JNOV, we view the evidence in the light most favorable to the plaintiff, give the plaintiff all reasonable beneficial inferences from that evidence, and ignore all evidence and inferences which contradict

plaintiff's claim.[1] We then determine whether the plaintiff has made a submissible case. "We will not overturn a jury verdict unless there is a complete absence of probative facts to support it."[2] In reviewing challenges to jury instructions, we check for error that "materially affected the merits of the case."[3] The party claiming prejudicial error must show that the offending instructions misdirected, misled, or confused the jury.[4]

Underlying KCMo's cross appeal are the payment provisions in its contract with EPIC. EPIC had based its breach of contract claim on KCMo' s failure to pay amounts due under the contract and for the extra work required by changed conditions. The contract stated that "in no event shall the total payment of this contract exceed the sum of $400,000.00 Dollars." Yet Section 1205 of the contract allowed for extra compensation for changed conditions. Section 1205 described "changed conditions" as "latent or subsurface conditions differing materially from those indicated in the contract or from those ordinarily encountered in performing work of the character involved, and which the Contractor could not have discovered by a careful investigation and examination of the of the site." Setting forth the procedures when the contractor encountered changed conditions, Section 1205 required the contractor to submit a written claim to the KCMo Director of Parks and Recreation, to allow KCMo to inspect, and to resume construction operations pending a decision on the claim. For the contractor to be entitled to additional compensation for the increased expenses caused by the changed conditions, the director had to find that the changed condi-

tions required work not contemplated by the contract. Section 1205 specified that "the Director's decision shall determine whether the claim is justified, and the Director's decision shall be final and binding on the parties."

KCMo argues in Point 6 that EPIC made no submissible breach of contract case because it could not prove entitlement under any contractual provision to extra compensation for work caused by changed conditions. In support, KCMo stresses that the Director of Parks and Recreation had sole, absolute discretion to approve or disapprove additional payment. We find, however, that KCMo overlooks the good faith requirement implied in contracts. Every Missouri contract carries an implied covenant of good faith and fair dealing.[5] This covenant prevents one party to a contract from exercising a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract.[6] The party claiming a breach of the implied covenant of good faith and fair dealing must present substantial evidence of the lack of good faith and fair dealing.[7]

On the matter of good faith and fair dealing, we determine that EPIC met its burden. EPIC presented evidence of the existence of the submerged rock haul road, KCMo's knowledge of it, and the failure to disclose it in the contract documents and during project consultations. Through testimony and exhibits, EPIC showed its investigation of the work site, its testing procedures, and evaluation of the subsurface soil samples. Other evidence was uncontested: EPIC provided KCMo with

1. *Resnik v. Blue Cross & Blue Shield,* 912 S.W.2d 567, 570 (Mo.App. E.D.1995).

2. *Id.* (citation omitted).

3. *Gorman v. Wal–Mart Stores, Inc.,* 19 S.W.3d 725, 730 (Mo.App. W.D.2000).

4. *Williams v. Finance Plaza, Inc.,* 23 S.W.3d 656, 658 (Mo.App. W.D.2000).

5. *Acetylene Gas Co. v. Oliver,* 939 S.W.2d 404, 410 (Mo.App. E.D.1996).

6. *Id.*

7. *Id.*

written change order requests. KCMo urged EPIC to continue working. EPIC persisted in its work to complete the spillway. The majority of the change order requests were not approved.

■ In further argument in Point 6, KCMo contends that EPIC as a contractor working on a public improvement project may not recover money above the contract price for "extra labor and materials when they are within the terms of the contract even though the extra expenditures were caused by unforeseen difficulties." [8]

KCMo's contention is unavailing because the evidence raised a factual controversy on whether the disputed work was not contemplated by the contract. Under EPIC's theory, the submerged road, which was not disclosed, necessitated work not contemplated by the contract. According to EPIC's evidence, the submerged road caused the seepage under the cofferdam. The seepage problems, in turn, interfered with the excavations and construction. So to remedy the problems, EPIC was required to pump the excess water, to lower the lake level, and to remove tons of rock. On the other hand, KCMo defended on the theory that EPIC's faulty construction of the cofferdam was responsible for the problems. KCMo presented evidence that, in building the cofferdam, EPIC failed to obtain the required design plans from an engineer and failed to comply with contract specifications. Under KCMo's defense theory, the work that EPIC did to correct the seepage problems arose from its own undertakings and was, consequently, included in its contractual duties.

As earlier noted, Section 1205 of the contract between KCMo and EPIC provided for additional compensation for work caused by changed conditions and not contemplated by the contract. EPIC and KCMo presented substantial and conflicting evidence on the work contemplated by

the contract. This factual dispute presented a matter submissible to the jury.

Asserting the lack of a submissible case, KCMo maintains that EPIC presented no evidence showing that the contract required it to pay for all work necessary. According to KCMo, the explicit terms of the contract provided for payment of the lump sum of $400,000.00 only. KCMo fails to recognize that Section 1205 with its implied covenant of good faith and fair dealing obligated it to pay for work caused by changed conditions and work not contemplated the Lake of the Woods and defendant City of Kansas City, by the contract. Evidence of the lump sum terms and the changed condition terms were before the jury. Substantial evidence supported the description of the agreement. The facts in the first paragraph of the verdict director provided appropriate instruction on resolving the contractual terms in issue.

For the above reasons, we conclude that EPIC presented a submissible case on its breach of contract action. The trial court did not err in overruling KCMo's motion for JNOV. Points 5 and 6 are denied. We now consider KCMo's claims of instructional error.

■ In Point 7, KCMo argues that errors in the breach of contract verdict director require reversal and remand for a new trial. In particular, KCMo argues that the verdict director misstated EPIC's pleaded theory. In its petition, EPIC alleged that KCMo had agreed to pay $400,000.00 in monthly progress payments and that the agreement provided for payment of additional compensation for unforeseen conditions that necessitated additional work. KCMo maintains that the theories pleaded failed to correspond to the facts hypothesized in the verdict director.

---

**8.** *Global Const. Inc. v. Mo. Highway & Transp. Comm'n,* 963 S.W.2d 340, 344 (Mo.App. W.D. 1997).

Additionally, KCMo asserts that the verdict director failed to specifically and accurately hypothesize the facts constituting the breach. EPIC pleaded that KCMo breached the contract by failing to approve change order requests that would allow payment of additional expenses, by blocking the outflow at the project site, by failing to inform EPIC about a rock haul road at the bottom of the lake, by obstructing and interfering with EPIC's work. The verdict director provided:

> In verdict B on plaintiff's claim for breach of contract, your verdict must be for plaintiff against defendant City of Kansas City, Missouri if you believe:
>
> First, plaintiff and defendant City of Kansas City, Missouri entered into an agreement whereby plaintiff agreed to construct a new spillway at the Lake of the Woods and defendant Kansas City, Missouri agreed to pay plaintiff for all work necessary to complete the project, and
>
> Second, plaintiff substantially performed its agreement in a workmanlike manner, and
>
> Third, defendant failed to perform its agreement, and
>
> Fourth, plaintiff was thereby damaged.
>
> The phrase "substantially performed" as used in this instruction means performance of all important parts of the contract with only slight variations.

Whether or not MAI 26.07 is the appropriate verdict director is not at issue in this case. However, the language used in the instruction is a point of contention.[9] KCMo focuses its arguments on the description of its agreement as "defendant City of Kansas City, Missouri agreed to pay plaintiff for all work necessary to complete the project." Because of the general language in the verdict director coupled with the length and complexity of the trial, KCMo concludes that the verdict director gave the jury a roving commission to determine what provision was breached.

While every cause of action has its own legal elements of proof, those legal elements do not appear in the jury's verdict directing instruction. Instead, the judge submits ultimate facts that enable the jury to apply the law to the facts. In other words, by telling the jury what to do on deciding the facts, the judge instructs the jury in applying the law to the facts. Consequently, only ultimate, disputed facts should be hypothesized in the verdict director.[10]

Here, the ultimate fact issue was whether there were "changed conditions"[11] which required extra compensation. The verdict director did not submit this issue. It submitted a general statement to the jury to find for EPIC if it believed that KCMo had agreed to pay "for all work *necessary*". This turned the contract on its head. Rather than asking the jury to determine whether EPIC had to perform extra work required by changed conditions that were compensable under the original contract, the verdict director submitted the issue of whether the work was ever necessary. This was not the issue the jury was required to resolve, however, and it misstated the terms of the contract. Although there was substantial evidence that unforeseen or latent conditions existed, because the verdict director allowed the jury to find for EPIC without reaching this issue, this error was prejudicial. KCMo, therefore, is entitled to a new trial.

---

9. *See Kaiser v. Lyon Metal Products, Inc.,* 461 S.W.2d 893, 899–901 (Mo.App.1970).

10. *See* John C. Milholland, *Why and How To Instruct a Jury,* MISSOURI APPROVED JURY INSTRUCTIONS at LXVII *et seq.* (5th ed.1996).

11. Section 1205 of the contract describes "changed conditions" as "latent or subsurface conditions differing materially from those indicated in the contract or from those ordinarily encountered in performing work of the character involved, and which the Contractor could not have discovered by a careful investigation and examination of the of the site."

In Point 8, KCMo submits that the breach of contract verdict form caused the jury to award duplicate damages on the breach of contract and the negligent maintenance of property claims. KCMo's chief complaint is the trial court's rejection of KCMo's proposed verdict form. On the line for providing the breach of contract damages, KCMo proposed adding language telling the jurors to exclude any items of damages awarded in the negligent maintenance of property claim. KCMo, therefore, claims entitlement to a new trial.

KCMo makes no showing on how the damage awards overlapped. On its negligent maintenance of property action, EPIC presented expert testimony on its damages. EPIC sought $100,000.00 as damages for losing its business. The jury returned an award of $50,000.00, but assessed 20% fault against EPIC. EPIC's net recovery was $40,000.00. The damages for the loss of the business concern were separate from the $625,000.00 sought for breach of contract.

We conclude that KCMo has failed to demonstrate that prejudicial error resulted from the verdict form related to the claim of negligent maintenance. Points 8 is denied.

### EPIC's Appeal: The Prompt Payment Statute

EPIC challenges the JNOV that set aside the jury's $454,572 interest award under the Prompt Payment Statute.

On appeal, "[w]e will affirm the trial court's grant of the JNOV only if we find that the plaintiff has failed to present a submissible case." [12] Because submissibility presents a question of law, our determination is *de novo*.[13] "A submissible case requires substantial evidence for every fact essential to liability." [14] In determining whether a submissible case has been made, we view the evidence in a light most favorable to the plaintiff and accord the plaintiff the benefit of all reasonable inferences that can be drawn from the evidence.[15] "However, we do not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences." [16]

Missouri's Public Works Prompt Payment Statute [17] promotes timely payment of contractors, subcontractors, and suppliers on contracts with public owners for public works construction projects.[18] This law requires public owners and contractors to make prompt payments and limits amounts withheld as retainage.[19] Statutory defenses are available to public owners who make untimely payments "in good faith for reasonable cause." [20] But for late payment in bad faith, the law allows courts to impose late payment interest of 1.5% per month in addition to the payment due. And it allows recovery of reasonable attorney fees.[21] Because its purpose is remedial, the Prompt Payment Statute should be interpreted liberally to allow courts to impose late payment interest when bad faith is found.[22]

12. *Sloan v. Bankers Life & Cas. Co.*, 1 S.W.3d 555, 564 (Mo.App. W.D.1999).

13. *See Davis v. Board Of Educ. Of St. Louis*, 963 S.W.2d 679, 684 (Mo.App. E.D.1998).

14. *Id.* (citation omitted).

15. *Sloan*, 1 S.W.3d at 564.

16. *Davis*, 963 S.W.2d at 684.

17. Section 34.057, RSMo (1994).

18. *See* Richard A. Stockenberg, *Prompt Pay for Government Construction Work in Missouri*, 48 J. Mo. Bar 11 (1992); *see also* the federal prompt payment act, 31 U.S.C.A. § 3901 *et seq.* (West 1983 & Supp.2000) and Missouri's prompt payment statute for private construction contracts § 431.180, RSMo (Supp.1999).

19. Section 34.057.1.

20. Section 34.057.5 & .6.

21. Section 34.057.6.

22. *City of Independence ex rel. Briggs v. Kerr Constr. Paving Co. Inc.*, 957 S.W.2d 315, 321 (Mo.App. W.D.1997) (in which the subcon-

This case involves payments owed by a public owner, *i.e.* KCMo, to a contractor, *i.e.* EPIC, on a public works construction project, *i.e.*, the zoo spillway project. Subsection 1 of the Prompt Payment Statute establishes its threshold requirements including the payment due dates, which are crucial to EPIC's appeal. The payment due dates are the events that trigger the remedies available for untimely payment. Section § 34.057.1(4) requires that the public owner pay the retainage to the contractor after the contract work is substantially complete and the public owner accepts. The retainage payment due date occurs within thirty days after acceptance AND the submission of the invoice and all other appropriate documentation and certifications in complete and acceptable form as required by the contract.[23] Under § 34.057.1(8), the public owner must make final payment to the contractor within thirty days of the due date. The final payment due date arrives when the project is complete OR when the authorized architect, engineer, or contracting authority certifies that the project is complete AND upon the filing with the owner of all documentation and certifications required by the contract in complete and acceptable form.[24]

In granting the JNOV for KCMo and in setting aside EPIC's award of late payment interest, the trial court found that EPIC had provided no evidence of submitting an invoice and other appropriate documentation and certifications as required by the contract and by subparagraphs 1(4) and 1(8) of the Prompt Payment Statute.

In its argument, EPIC maintains that the trial court inappropriately ignored the jury's finding that KCMo withheld payment in bad faith. Asserting its compliance with all contractual obligations, EPIC insists that it had submitted evidence of the proper documentation, which included its payment request dated July 19, 1993, testimony about a certification of completion, and its numerous change order requests. EPIC maintains that KCMo refused to act on the documentation provided by not granting the change orders and not paying the retainage. According to EPIC, the trial court's setting aside its interest award defeated the remedial purpose of the Prompt Payment Statute.

For payment of the retainage and for final payment, the contract between EPIC and KCMo specified that documentation be provided. The required documents included the applications for payment; certificates of completion; con-

---

tractor sued the contractor for failure to timely pay amounts owed on a public works construction contract).

**23.** Section 34.057.1(4) provides in pertinent part:

> The public owner shall pay the retainage, less any offsets or deductions authorized in the contract or otherwise authorized by law, to the contractor after substantial completion of the contract work and acceptance by the public owner's authorized contract representative.... Such payment shall be made within thirty days after acceptance, and the invoice and all other appropriate documentation and certifications in complete and acceptable form are provided, as may be required by the contract documents.

**24.** Section 34.057.1(8) provides:

> The public owner shall make final payment of all moneys owed to the contractor, less

any offsets or deductions authorized in the contract or otherwise authorized by law, within thirty days of the due date. Final payment shall be considered due upon the earliest of the following events:
> (a) Completion of the project and filing with the owner of all required documentation and certifications, in complete and acceptable form, in accordance with the terms and conditions of the contract;
> (b) The project is certified by the architect or engineer authorized to make such certification on behalf of the owner as having been completed, including the filing of all documentation and certifications required by the contract, in complete and acceptable form; or
> (c) The project is certified by the contracting authority as having been completed, including the filing of all documentation and certifications required by the contract, in complete and acceptable form.

tractor's affidavit; bills for labor, equipment, and materials; project construction records; final lien waivers; affidavit of prevailing wage compliance.

Asserting compliance with the documentation and certification requirements, EPIC refers to evidence of its change order requests, a certification of completion, and a payment request. The change order requests sought payment for extra work required to complete the contract. Although pertinent to EPIC's breach of contract claim, the change order requests have no bearing on its prompt payment claim. Testimony regarding a certificate of completion came into evidence. EPIC's expert witness testified that he had seen a certificate of substantial completion dated August 3, 1993. Although that witness believed that a city engineer had signed the certificate, he noted that the certificate contained blanks and was only partially complete. Other than this testimony, EPIC never presented evidence of a certificate of completion. In its last payment application, Contract Payment Request # 9 Revised dated July 19, 1993, EPIC sought payment of $11,080.07. Denying approval of that payment request, the KCMo project consultant sent EPIC a letter explaining the deficiencies: miscalculation of the amount due, failure to advise of suppliers' claims, incomplete lists of remaining work. EPIC presented no evidence that it had ever corrected those deficiencies. We determine that EPIC failed to present sufficient evidence showing its compliance with the documentation required by contract and the Prompt Payment Statute.

EPIC's failure to provide the proper documentation and certifications destroyed the submissibility of its case. Essential to a claim for late payment interest is the bad faith withholding of payments due.[25] To avail itself of the remedies in the Prompt Payment Statute, the claimant is required to prove that the public owner withheld from the contractor payments due and that the withholding was not in good faith for reasonable cause.[26] The *Briggs* case instructs that the bad faith determination is a question of fact that can be submitted to the jury.[27]

Nevertheless, before the jury makes its factual determination on a statutory claim, the trial court is authorized to make a threshold determination on the submissibility of the case.[28] The Prompt Payment Statute carries the threshold provisions specifying when payment is due: upon substantial completion or completion of the project and upon submission of the proper documentation and certifications.[29] Because the payment due provisions determine when withholding occurs, they directly relate to the elements of the claim and they trigger the remedies under the Prompt Payment Statute. In determining whether the plaintiff has made a submissible case for late payment interest, the trial court must necessarily determine compliance with the statutory prerequisites that bear on the elements of the claim. Because the late payment interest remedy is a statutory creation, compliance with the

---

**25.** Section 34.057.6 provides in pertinent part:

> [N]o late payment interest shall be due and owing for payments which are withheld in good faith for reasonable cause pursuant to subsections 2 and 5 of this section. If it is determined by a court of competent jurisdiction that a payment which was withheld pursuant to subsections 2 and 5 of this section was not withheld in good faith for reasonable cause, the court may impose interest at the rate of one and one-half percent per month calculated from the date

of the invoice and may, in its discretion, award reasonable attorney fees to the prevailing party.

**26.** *Id.*

**27.** *Briggs,* 957 S.W.2d at 321–22.

**28.** *King v. Morgan,* 873 S.W.2d 272, 276 (Mo. App. W.D.1994).

**29.** Section 34.057.1(4) & (8).

statutory prerequisites is mandatory. Contrary to EPIC's contention, requiring it to comply with the statutory prerequisites does not thwart the remedial purpose of the Prompt Payment Statute.[30]

By failing to present evidence of its compliance with the documentation prerequisites, EPIC made no submissible claim under the Prompt Payment Statute and had no basis for submitting the bad faith withholding issue to the jury. The trial court properly granted JNOV and appropriately set aside the jury's award of late payment interest. Our determination that EPIC made no submissible case disposes of its entire claim under the Prompt Payment Statute. We will, therefore, not consider its remaining points concerning the conditional new trial and the denial of attorney fees. EPIC's point on appeal is denied.

### Conclusion

We accordingly reverse the judgment on the breach of contract claim, and order a new trial on that claim only. The other claims in the trial court's amended judgment, will be affirmed.

LOWENSTEIN and LAURA DENVIR STITH, JJ., concur.

---

30. *Cf. Grgic v. Cochran,* 740 S.W.2d 358, 359 (Mo.App. E.D.1987) (holding that, although the mechanics lien law is a remedial statute, the policy of liberal construction does not relieve the lien claimant from substantial compliance with the just and true account requirement to secure the statutory benefits).